# Exhibit 5

## USE AGREEMENT

This USE AGREEMENT (the "Agreement") is entered into as of November 1, 2011 (the "Effective Date"), by and between the City of New York, by and through its Department of Parks and Recreation (the "City"), and Tavern International, LLC (the "Concurrent User"). The City and the Concurrent User are each a "Party" and together the "Parties."

WHEREAS, the City owns and operates (directly or through concession or other arrangement) a facility called "Tavern on the Green" in Central Park in the City of New York and, directly and through agreements with third parties, has operated and intends to continue to operate a restaurant and/or other amenities at this location under the name "Tavern on the Green";

WHEREAS, Tavern on the Green Limited Partnership, a New York limited partnership ("TOG") or LeRoy Adventures, Inc., a New York corporation ("LeRoy") and their predecessors and affiliates operated the restaurant known as "Tavern on the Green" as a concessionaire of the City at the Central Park location from approximately 1976 until December 31, 2009;

WHEREAS, the predecessor to TOG applied for and obtained United States trademark and service mark registrations for TAVERN ON THE GREEN for "restaurant services," U.S. Registration No. 1,154,270, issued May 12, 1981 and for "oils for cooking and for food, namely, flavored oils, dipping oils" and "salad dressings; condiments, namely sauces, dipping sauces;" U.S. Registration No. 3,494,658, issued September 2, 2008;

WHEREAS, Jil Mazer-Marino is the Chapter 7 Trustee (the "Trustee") of the Chapter 7 estates (the "Estate") of TOG and LeRoy;

WHEREAS, the City and the Trustee have resolved their disputes concerning ownership and use of the name "Tavern on the Green" at the Central Park location and for products and services elsewhere, and such resolution is memorialized in a "Stipulation Resolving Disputes Between Tavern On The Green Limited Partnership and Leroy Adventures, Inc. and The City of New York and The New York City Department of Parks and Recreation" (the "Stipulation") filed with the U.S. Bankruptcy Court for the Southern District of New York on April 15, 2011;

WHEREAS, the Trustee, in furtherance of her fiduciary duties to the Estate, has sold to Concurrent User the right to register and use the Concurrent User's Marks and Product Marks (as defined below) and ownership of the Oil and Dressing Registration and Mark (as defined below), pursuant to and subject to the terms and conditions of this Agreement; and

WHEREAS, consistent with the resolution of the disputes between the City and the Trustee, the City wishes to enter into this Agreement with Concurrent User, and Concurrent User wishes to enter into this Agreement with the City.

NOW, THEREFORE, in consideration of the promises set forth below, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree to the terms set forth herein.

2011 - 035027

1.  Definitions

1.01  "Acceptable Level of Quality" is defined in Section 10.

1.02  "Central Park Location" means a structure in Central Park, New York, historically operated as the "Tavern On The Green" restaurant.

1.03  "Central Park Goods" means any and all souvenir items (including without limitation t-shirts, post cards, key chains, coffee mugs, plates, dishes and other similar items) bearing the Mark and offered directly or indirectly by the City, its agents, or its concessionaires at the Central Park Location or at a City Retail Outlet, *i.e.*, an outlet operated by the City or its agents.

1.04  "Central Park Services" means restaurant, bar, visitor center, and any food, beverage or other service offered directly or indirectly by the City at the Central Park Location.

1.05  "City" means the City of New York, its assigns, licensees, vendors, contractors, agents and/or concessionaires and any other person or entity authorized to act on the City's behalf.

1.06  "City Retail Outlet" means a retail outlet operated by the City.

1.07  "Concurrent User" means the Concurrent User named above or any successor or assignee of such party under Section 8 of this Agreement.

1.08  "Concurrent User's Marks" means the Mark when such words are combined with and accompanied by differentiating language in the nature of a geographic or location identifier as set forth in Section 2.04(b) and used for restaurant, bar and catering services.

1.09  "Current Logo" means the Tavern on the Green stylized design annexed hereto as Exhibit A.

1.10  "Mark" means "Tavern on the Green."

1.11  "Oil and Dressing Registration and Mark" means the U.S. Patent and Trademark Office registration for "Tavern on the Green" for "oils for cooking and for food, namely, flavored oils, dipping oils" and "salad dressings; condiments, namely sauces, dipping sauces" under Registration No. 3,494,658, issued September 2, 2008.

1.12  "Product Marks" means "Tavern on the Green" for any goods.

1.13  "Product Mark Registrations" means any registration for "Tavern on the Green" or the Current Logo for goods.

1.14  "Product Mark Registration Period" means the seven (7) year period following the earlier of the Effective Date of this Agreement or six (6) months after the Effective Date of the Stipulation.

1.15    "Product Restricted Area" means the City of New York, the counties of Nassau, Suffolk, Westchester and Rockland in the State of New York and the counties of Bergen, Essex, Union, Middlesex and Monmouth in the State of New Jersey.

1.16    "Restaurant Mark" means "Tavern on the Green" for restaurant services.

1.17    "Restaurant Registration" means the U.S. Patent and Trademark Office registration for "Tavern on the Green" for "restaurant services," under U.S. Registration No. 1,154,270, issued May 12, 1981.

1.18    "Restaurant Restricted Area" means the States of New York, New Jersey, and Connecticut and the portion of Pennsylvania detailed in Exhibit B.

## 2.    The Restaurant Mark and the Concurrent User's Marks

2.01    The City owns the Restaurant Registration and the Restaurant Mark and all associated goodwill, and retains and possesses the rights to (a) use and register the Restaurant Mark, (b) operate a restaurant and any other facility offering Central Park Services or any other City services using the Mark at the Central Park Location, (c) operate restaurants using the Mark at other locations within the five boroughs of the City, and (d) use and register the Mark for all City services or Central Park Services provided at the Central Park Location.   So long as this Agreement remains in effect, the City shall not use or authorize others to use the Restaurant Mark and the Current Logo for restaurant services outside the five boroughs of the City and, as set forth in Section 2.04, the Concurrent User shall use the Restaurant Mark and Logo only outside of the Restaurant Restricted Area.

2.02    The City owns and shall be entitled to register the Current Logo for restaurant services, catering services and bar services and for all Central Park Services.

2.03    The Concurrent User shall assist the City by taking any steps necessary to effectuate the transfer of ownership of the Restaurant Registration to the City or to effectuate the intent of this Agreement with respect to ownership and use of the Mark at the Central Park Location for the Central Park Services or any other City services.

2.04    The City and the Concurrent User agree that the City shall not object to the Concurrent User's use of the Concurrent User's Marks and the Current Logo for restaurant services, provided such use conforms to the following limitations:

(a)    The Concurrent User shall use the Concurrent User's Marks and Current Logo only outside of the Restaurant Restricted Area.

(b)    The Concurrent User, when using the Concurrent User's Marks, shall (i) include differentiating language in the name of the establishment in the nature of a geographic or location identifier as a prefix or suffix set off by a hyphen, colon, "@" sign or the words "at" or "in" (e.g., "Tavern on the Green – Los Angeles"), and (ii) as required in Exhibit C, use clear and prominent disclaimers as follows: "Not affiliated with Tavern on the Green in Central Park in New York City".

(c)     No use of the Concurrent User's Mark and Current Logo by the Concurrent User shall mention Central Park, or feature any pictures or other depictions of Central Park or any Central Park structures, including pictures or other depictions of the Central Park Location or any other City trade or service marks, in conjunction with use of the Mark by the Concurrent User, without the prior written consent of the City; provided, however, that the Concurrent User is permitted to use the images annexed hereto as Exhibit D and substantially similar images of the interior of the Central Park Location as operated by TOG and LeRoy from 1976 to 2009. For the avoidance of doubt, the Parties acknowledge that the Concurrent User shall have the right to use any and all elements of the décor associated with the restaurant operated by TOG and LeRoy at the Central Park Location from 1976 to 2009, including without limitation light fixtures, furniture styles, window treatments, floor coverings, wall coverings, murals, woodwork, table settings, service items, accessories, and related items.

(d)     The Concurrent User shall use the Concurrent User's Marks and Current Logo solely to operate restaurants, bar services and catering operations for dining of a high quality with regard to food quality, cleanliness, food handling and preparation and compliance with any and all laws, rules and regulations regarding such services. Restaurants using the Concurrent User's Mark will be full-service restaurants, featuring host/hostess and table service, high-quality made-to-order food and distinctive décor; buffet service may also be offered. For the avoidance of doubt, fast food, drive-through and cafeteria style eating establishments are specifically prohibited; provided, however, that high quality, gourmet-style take-out and mobile service (i.e., "food truck" and food cart) establishments will be permitted, and may offer high quality, gourmet-style pre-packaged prepared foods.

(e)     The Concurrent User agrees not to challenge the City's use and registration of the Restaurant Mark and Current Logo or its use or registration of the Mark for Central Park Services or other City services.

(f)     The Concurrent User shall not attempt to register the Restaurant Mark or the Current Logo for restaurant services or other Central Park Services; provided, however, that the City shall not object to or file any opposition to an application by the Concurrent User for a United States or foreign trademark registration for a Concurrent User's Mark; and provided, further, that the City shall not seek to cancel any registration resulting therefrom other than as set forth in Section 12.02. Any and all costs and expenses associated with the filing and prosecution of such applications, the maintenance of any ensuing registrations, and any enforcement of or against such registrations, shall be at the Concurrent User's sole cost and expense, and the City shall be promptly reimbursed by the Concurrent User for any costs incurred by the City in relation thereto, including reasonable compensation for the time of any City employee in connection therewith. As long as this Agreement is in effect, the City may not file an application to have the Restaurant Mark or Current Logo registered for restaurant services outside the United States (a "Foreign Registration").

(g)     The Concurrent User shall use the Concurrent User's Marks and Current Logo only in connection with permitted services, as set forth in Section 2.04(d) above, and shall not use the Concurrent User's Marks and Current Logo in connection with any illegal services, topless or "strip" clubs, pornography, tobacco (provided, that Concurrent User's establishments may allow smoking consistent with local laws and regulations), pyrotechnics, and other

categories that in the reasonable judgment of the City are objectionable and will diminish the goodwill associated with the Restaurant Mark, and which are identified by the City and which the Concurrent User is provided reasonable written notice.

(h)     The parties acknowledge that the City intends to continue to sell food and food products at the Central Park Location under the Restaurant Mark (whether directly or indirectly), but nothing herein shall require the City to continue to use the Restaurant Mark at the Central Park Location and its failure to do so shall not affect the validity of its rights in the Restaurant Mark.

**3.     Product Marks**

3.01     The Concurrent User owns the Oil and Dressing Registration and Mark and associated goodwill and possesses the right to use and register such mark in the United States, subject to the rights granted to the City and subject to all of the restrictions and limitations contained in this Agreement.

3.02     The City agrees not to challenge the Concurrent User's (a) use and registration of the Oil and Dressing Mark, (b) Product Mark Registrations issued to Concurrent User during the Product Mark Registration Period and (c) use of the Product Marks registered pursuant to such Product Mark Registrations provided such use is in compliance with the terms and conditions of this Agreement.

3.03     During the Product Mark Registration Period, (a) the Concurrent User has the exclusive right to apply to register the Mark and the Current Logo for products and services for which the Concurrent User has the bona fide intention to use the Mark in the United States, so long as such products and services are reasonably related to restaurant and catering operations, food, food preparation and food service items, home furnishings, décor, apparel and accessories, and (b) the City shall be prohibited from using the Mark and the Current Logo for products other than Central Park Goods, Services or City services. At the conclusion of the Product Mark Registration Period, the Concurrent User shall retain ownership of all Product Mark Registrations issued to the Concurrent User during the Product Mark Registration Period for the term of any such registrations, including all renewals and extensions, and shall own and have the exclusive right to use such Product Marks. After the Product Mark Registration Period, Concurrent User shall withdraw any pending applications for which no registration has issued, and the City shall have the right to register Product Marks and the Current Logo for any goods and services where no Product Mark Registration was issued during the Product Mark Registration Period.

3.04     Use of the Product Marks, the Current Logo and the Oil and Dressing Mark by the Concurrent User shall be subject to the following limitations:

(a)     All uses of the Product Marks or Oil and Dressing Mark on products, packaging, advertising, and promotional materials shall be accompanied by clear and prominent disclaimers as specified in **Exhibit C**, stating: "Not affiliated with Tavern on the Green in Central Park in New York City."

5

(b)    Products, their packaging, advertisement and displays to which the Mark is applied by the Concurrent User shall not mention Central Park, nor feature any pictures or other depictions of Central Park or Central Park structures, including the Central Park Location or any other City trade or service mark, without the prior written consent of the City; provided, however, that the Concurrent User is permitted to use the images annexed hereto as Exhibit D, and other substantially similar images of the interior of the Central Park Location.

(c)    The Concurrent User shall not sell or allow to be sold products bearing the Mark in retail stores physically located in the Product Restricted Area, without the prior written consent of the City to be granted or withheld in the City's sole and absolute discretion.  In the event that the City consents to sales of products bearing the Mark within the Product Restricted Area, the City shall be entitled to receive a royalty for such sales as follows: (i) if such sale is made by a licensee of Concurrent User, twenty percent (20%) of any royalties received by Concurrent User attributable to such sales, and (ii) if such sale is made directly by the Concurrent User, four percent (4%) of all gross revenue attributable to such sales.  Such sales shall be subject to the audit provisions set forth in Exhibit F hereto.

Concurrent User agrees to use the Product Mark and Current Logo only in connection with legal goods and services and not be in connection with pornography, tobacco, pyrotechnics, and other categories that in the reasonable judgment of the City are objectionable and will diminish the goodwill associated with the Mark, and which are identified by the City and for which the Concurrent User is provided reasonable written notice.

Notwithstanding anything contrary in this Agreement, Concurrent User shall be permitted to sell off, and sublicense the right to sell-off, the current stock of salad dressings, oils and marinades bearing the Product Mark (including inventory and goods to be finished from ingredients, components and work-in-process in current stock) outside the Product Restricted Area.  At execution, the Concurrent User shall provide the City with a notarized inventory of all current stock of salad dressings, oils and marinades bearing the Product Mark (including inventory and goods to be finished from ingredients, components and work-in-process in current stock).  Inventory and sell off of all such items shall be subject to the audit provisions contained in Exhibit F hereto.

3.05    Notwithstanding anything contrary in this Agreement, the City shall be permitted to produce Central Park Goods solely for sale at the Central Park Location and at any City Retail Outlet.  The Central Park Goods shall not include any food products, cooking utensils, or tabletop products (e.g., eating utensils, table linens, and placemats), but does include souvenir mugs, cups, glasses, plates, dishes, spoons and similar souvenir items.

3.06    To the extent necessary to permit the City to produce and sell such Central Park Goods, Concurrent User hereby grants to the City a perpetual, irrevocable, transferable, sublicensable, royalty-free license under any Product Mark Registrations and any common-law rights to Product Marks or the Current Logo used and/or registered by the Concurrent User.

4.    **Territory**

4.01    The territory of this Agreement shall be the United States.

## 5.   Logos and Internet Domain Names

5.01    Either Party, at any time, in its sole and absolute discretion, may elect to develop and utilize its own exclusive logo consistent with the other terms and conditions of this Agreement so long as such logos or marks are otherwise consistent with the terms and intent of this Agreement and would not otherwise infringe on the rights of the other Party or cause confusion, mistake or deception on the part of consumers.

5.02    The City shall own and have exclusive right to use the internet domain names or URLs www.tavernonthegreen.com and www.tavernonthegreen.net and any other URLs consisting of "Tavern on the Green" alone with any other TLD extension. Concurrent User may register and use other domain names utilizing "Tavern on the Green" in connection with uses permitted under this Agreement provided that the domain name include language differentiating the domain names from www.tavernonthegreen.com and www.tavernonthegreen.net (e.g., www.tavernonthegreenbrands.com or www.tavernonthegreen-LA.com).

## 6.   Avoidance of Confusion

6.01    The Parties agree to cooperate and consult with each other in good faith if future conditions or developments suggest to either the possibility that the Parties' respective use of the Restaurant Mark or the Concurrent User's Marks or the Product Marks is likely to result in confusion or dilution, all with the view to insuring that no substantial likelihood of confusion or dilution between the Parties' use of the said marks, as they are actually used, shall occur.

## 7.   Licenses Issued by the Concurrent User and the City

7.01    The Concurrent User and the City shall each require and include provisions that are consistent with and reflect the terms of this Agreement in any license or sublicense agreements pertaining to the use of the Restaurant Mark, the Concurrent User's Marks, the Current Logo, or the Product Marks as permitted by this Agreement.

7.02    In the event that a licensee or sublicensee of the Concurrent User violates the provisions of its license or sublicense that reflect the terms of this Agreement, the Concurrent User shall cause such licensee or sublicensee promptly to comply with such provisions:

(a)    If the licensee or sublicensee fails to correct such violation and Concurrent User fails promptly to take steps to enforce such provisions within ten (10) business days after receiving written notice from the City of a violation of such provisions, and fails to complete such enforcement within ninety (90) days after receiving such written notice, and the licensee or sublicensee fails to correct such violation, the City shall be entitled to enforce such provisions as a third party beneficiary of such provisions (such right to be included in all licenses or sublicenses of the Concurrent User) and shall be entitled to indemnification from the Concurrent User for the reasonable cost of such enforcement actions, including attorneys fees. Any violation of a license or sublicense provision relating to the quality of restaurant services or goods bearing the Mark as provided in Section 2.04(d) and Section 10 of this Agreement shall be governed by Section 10 and not by this Section 7.02(a).

(b)      Notwithstanding Section 7.02(a), in the event that a licensee or sublicensee of the Concurrent User violates a provision of its license or sublicense that reflects the terms of this Agreement concerning sales of goods or services within the Product or Restaurant Restricted Areas; the proper use of disclaimers under Sections 2.04(b) or 3.04(a), or the restrictions in Sections 2.04(c) or 3.04(b); or the sale of illegal or prohibited services or goods under Sections 2.04(g) or 3.04(d), and such licensee or sublicensee fails to cure such violation within twenty (20) days after Concurrent User receives written notice of such breach, the City shall be entitled to enforce such provisions as a third party beneficiary of such provisions (such right to be included in all licenses or sublicenses of the Concurrent User), and shall be entitled to indemnification from the Concurrent User for the reasonable cost of such enforcement actions, including attorneys fees. In the event that the City commences enforcement against a licensee or sublicensee pursuant to this Section 7.02(b), including a written demand for compliance, and such licensee or sublicensee fails to cure such violation within fifteen (15) days thereafter, the City acting on behalf of the Concurrent User may terminate the license or sublicense at the particular location where such violation occurred or for the goods in relation to which such violation occurred, on three (3) business days notice, and Concurrent User hereby grants City the irrevocable right and authority to take such action.

7.03      Any licensees or sublicensees of Concurrent User or the City, and any successors thereto, must agree in writing to be bound by all the terms, conditions and limitations contained in this Agreement and shall execute an agreement in the form annexed hereto as Exhibit G. Any license or sublicense not complying with this requirement shall be void and without effect. The Concurrent User shall provide the City with a copy of each license and sublicense, including any amendments or renewal agreements, within five (5) business days after the execution of same; provided, however, that Concurrent User may redact the financial terms thereof.

8.      **Assignment**

8.01      The Concurrent User may assign this Agreement to a third party, provided that such third party and any successor thereto agree in writing to be bound by all the terms, conditions and limitations contained in this Agreement. The assignee shall execute an agreement in the form annexed hereto as Exhibit H. Any assignment not complying with this requirement shall be void and without effect. Such assignments as described herein shall only be in whole and not in part, i.e., there shall only be one Concurrent User at any given time. The Concurrent User shall provide the City with a copy of any assignment under this Section 8 within five (5) business days of the execution of same.

8.02      Each right and obligation of the Concurrent User hereunder shall be a right or obligation of the successors and assigns of the Concurrent User, unless explicitly stated to the contrary herein.

8.03      The Parties hereby acknowledge and agree that upon the Concurrent User's assignment of this Agreement, the rights, duties and obligations of the assignor hereunder shall immediately cease and such rights shall be fully vested in, and such duties and obligations shall be delegated to, and be the sole obligations of, the assignee of this Agreement. Reference to the Concurrent User in this section shall include all agents, employees and representatives thereof.

## 9.   Actions Involving Alleged Infringements

9.01     The City or its successors shall have the sole right, authority and discretion to take action regarding allegedly infringing or other conduct that may adversely affect the Restaurant Mark or any other mark related to the Central Park Goods or Services or other City services within the Restaurant Restricted Area at its own cost.

9.02     The Concurrent User shall have the first right to take action regarding allegedly infringing or other conduct that may affect the Concurrent User's Marks or the Product Marks, at its own cost.  The City will cooperate in such enforcement efforts by the Concurrent User to the extent legally necessary and at the sole cost of the Concurrent User; provided, however, that where the City is not an indispensible party, the City shall not be required to join in any action as a party unless Concurrent User agrees to pay all fees, costs and expenses of mutually approved outside counsel to represent the City.  The Concurrent User shall indemnify and hold the City harmless from any expense, cost or liability incurred by the City in connection with any enforcement actions on the part of the Concurrent User, including the cost of separate counsel to represent the City in the event that the City is named as a defendant in any action arising from or related to the alleged actions of the Concurrent User or its licensees or sublicensees.

9.03     The Concurrent User shall not pursue or settle any claim or action on terms that may adversely affect the City's interest in the Mark absent the prior written approval of the City, which shall not be unreasonably withheld.

9.04     The City and the Concurrent User shall reasonably cooperate at their own expense in opposing applications for registration of the Mark or any confusingly similar variation, by any third party that would adversely affect their rights, including but not limited to an application to register the Mark filed by Eric Karich for "bar and restaurant services" at the U.S. Patent and Trademark Office (Ser. No. 77/902,552).

9.05     If enforcement efforts relating to the Restaurant Mark, the Concurrent User's Marks or the Product Marks are initiated by one Party and later joined by the other Party and result in a monetary award or settlement being paid by the infringer, such monies shall first be used to reimburse both Parties for all out-of-pocket expenses incurred in connection with such proceeding; thereafter, any monies remaining shall be distributed as follows:

(a)     For enforcement related to restaurant services, the City shall receive seventy-five percent (75%) and the Concurrent User shall receive (25%).

(b)     For enforcement related to Product Marks, the Concurrent User shall receive seventy-five percent (75%) and the City shall receive (25%).

9.05     Licensees and sublicensees of the Concurrent User shall report alleged infringements to the Concurrent User (which shall forward such reports to the City), but licensees and sublicensees otherwise shall have no authority to take any enforcement action with respect to any alleged infringement of the Mark.

10.  **Minimum Standards**

10.01   Concurrent User acknowledges that the Mark represents a high level of quality in the provision of restaurant services, bar services and catering services with regard to cleanliness, food handling and preparation and compliance with laws and regulations regarding such services (such level of quality, and all requirements of this section, the "Acceptable Level of Quality"). With respect to any services offered by the Concurrent User under the Concurrent User's Mark, the Concurrent User agrees to maintain an Acceptable Level of Quality.   Any licensee or sublicensee of the Concurrent User's Mark shall have experience or training in restaurant operations.

10.02   All products offered under the Mark by Concurrent User or the City, or their respective licensees and sublicensees, must meet or exceed the requirements imposed by any laws, rules or regulations of any locations where they are marketed or sold and shall be consistent with a high level of quality and workmanship for comparable goods. With respect to products offered under the Product Marks that the City consents to be sold in the Product Restricted Area, Concurrent User shall comply with the requirements of Exhibit E hereto.

10.03   The City shall have the right to ascertain whether the goods or services offered by the Concurrent User or its licensees or sublicensees under the Mark are in compliance with the provisions of this section, and the Concurrent User shall reasonably cooperate with the City's efforts to reasonably determine such compliance. The City shall have the right to inspect and approve restaurant services offered under the Concurrent User's Mark or goods licensed for sale within the Product Restricted Area. The Concurrent User shall also permit the City reasonable access to Concurrent User's restaurant facilities during normal business hours to inspect the services offered under the Concurrent User's Mark, and shall require its licensees and sublicensees to provide such access to the City.

10.04   If the City reasonably believes that the Concurrent User or any licensee or sublicensee is not maintaining an Acceptable Level of Quality respecting a particular service offered under the Concurrent User's Mark, the City shall provide written notice to Concurrent User, setting forth with reasonable specificity the grounds upon which this determination is based.

(a)      Concurrent User shall provide a written reply within seven (7) business days (the "Reply") that either (i) confirms that the objectionable items have been corrected (or if not reasonably capable of correction within seven (7) business days, that such objectionable items are being corrected and will be corrected within thirty (30) days), (ii) refutes the objections raised by the City, or (iii) otherwise responds to such objections.

(b)      If the City reasonably believes that the alleged failure to maintain an Acceptable Level of Quality is still ongoing (other than an item not reasonably capable of correction within seven (7) business days) after the receipt of the Reply (or if Concurrent User fails to reply during such seven (7) business day period), the City shall provide further written notice to Concurrent User setting forth with reasonable specificity the City's continuing objection and Concurrent User shall then have seven (7) business days in which to provide a written reply to the City that (a) confirms that the objectionable items have been corrected, or (b) refutes the objections raised by the City.

(c)     If Concurrent User has stated that the alleged failure is an item not reasonably capable of correction within seven (7) business days, Concurrent User shall report every ten (10) business days to the City on its progress in correcting such failure during such thirty (30) day period.

(d)     In the event that a failure to maintain an Acceptable Level of Quality has not been corrected within the time periods set forth above, the City shall have the right (i) if the location is operated by Concurrent User, to terminate this Agreement with regard to the Concurrent User's right to use the Concurrent User's Mark at the affected, location, and (ii) if the location is operated by a licensee or sublicensee of Concurrent User, the City acting on behalf of Concurrent User may terminate the license or sublicense at the particular location where such violation occurred, and Concurrent User hereby grants City the irrevocable right and authority to take such action, on three (3) business days' written notice.

10.05  With regard to the Central Park Goods, the City acknowledges that any Product Mark Registration licensed by Concurrent User to the City pursuant to Section 3.06 represents a high level of quality with regard to such products. With respect to any Central Park Goods subject to such license, the City agrees to maintain a level of quality consistent with such high level of quality and consistent with the products offered by Concurrent User under such Product Marks.

11.    **Assistance with Registration of Marks**

11.01  If any application by the City to register a mark that is within the City's rights under this Agreement is refused, and such refusal is based in whole or in part upon the existence of an application or registration filed by Concurrent User, Concurrent User shall provide such assistance as may be required to permit the City to proceed with the desired registration and/or use of the Mark (initially in the form of a consent to register) at the City's cost.

11.02  If any application by Concurrent User to register a mark that is within Concurrent User's rights under this Agreement is refused, and such refusal is based in whole or in part upon the existence of an application or registration filed by the City, the City shall provide such assistance as may be required to permit the Concurrent User to proceed with the desired registration and/or use of the Mark (initially in the form of a consent to register) at the Concurrent User's cost.

12.    **Term and Termination**

12.01  Unless terminated, this Agreement shall remain in effect as long as both Parties are using the Mark for any goods or services, provided, however, that if only one Party is using the Mark on any goods or services, the Agreement shall nonetheless remain in effect as long as, and only so long as, the Party not using the Mark (i) has a *bona fide* intent to begin using, and actually begins using, the Mark on any goods or services no later than December 31, 2013, or (ii) ceased using the Mark, but has reasonable grounds for ceasing use and has plans to, and actually does, resume use of the Mark for any goods or services in the reasonably foreseeable future, not to exceed three (3) years from the date use ceased.

12.02  In the event of a breach, other than a *de minimis* breach, by Concurrent User of a provision of this Agreement concerning (i) sales of goods within the Product Restricted Area or services within the Restaurant Restricted Areas; (ii) the proper use of disclaimers under Sections

2.04(b) or 3.04(a), or the restrictions in Sections 2.04(c) or 3.04(b); (iii) the sale of illegal or prohibited services or goods under Sections 2.04(g) or 3.04(d) or (iv) the execution of a license or sublicense that is not consistent with and does not reflect the terms of this Agreement as required by Section 7.01, the City shall provide written notice to the Concurrent User of such breach, and if the Concurrent User does not cure such breach within twenty (20) business days after Concurrent User's receipt of written notice of such breach from the City, the City may provide written notice to Concurrent User immediately terminating this Agreement and/or the City's consent to use the Concurrent User's Mark or Product Mark with regard to the particular goods or services that are the subject of such breach and/or the City may take such other enforcement actions as it deems appropriate to protect its interests, including but not limited to, filing an action for trademark infringement and/or a petition to cancel the registrations for such marks, and in such event and for purposes of such action, the Concurrent User agrees that a likelihood of consumer confusion shall be presumed to exist and Concurrent User irrevocably waives and agrees not to interpose any legal or equitable defense that does not go to the merits of the action, including incontestability of the registration, statute of limitations, waiver, laches, delay or estoppel. In the event of a breach of the type addressed in this Section 12.02 that is a de minimis breach, the City shall have the right to provide written notice to the Concurrent User of such breach demanding cure. For the avoidance of doubt, this Section 12.02 applies to the Concurrent User, and Section 7.02 applies to licensees and sublicensees of the Concurrent User.

12.03  In the event that a failure to maintain an Acceptable Level of Quality has not been corrected within the time periods set forth in Section 10.04 above, the City shall have the right to terminate this Agreement with regard to the Concurrent User's right to use the Concurrent User's Mark at the affected location, pursuant to Section 10.04(d).

12.04  Concurrent User acknowledges that the City will suffer immediate and irreparable injury by reason of any breach specified in Section 12.02 and 12.03 that is not cured within the time periods specified therein, and agrees that remedies available at law (such as monetary damages) are inadequate to compensate for such injury. The City shall not be required to post a bond in any action to enforce these provisions.

### 13.    Representations and Warranties of Concurrent User

13.01  The Concurrent User hereby represents and warrants that (i) such Party is a limited liability company duly organized and validly existing under the laws of its state of formation, (ii) such Party has full right, power and authority to enter into this Agreement and to perform its obligations hereunder and (iii) this Agreement is a legal, valid and binding obligation of such Party, enforceable against it in accordance with its terms.

### 14.    Indemnification and Insurance

14.01  Each Party hereby agrees to indemnify, defend and hold harmless the other, their affiliates and respective officers, agents, and employees, from and against any claims, judgments, demands, causes of action, damages, losses, costs and expenses, including but not limited to reasonable attorneys' fees, which may be made or asserted by third persons in connection with the indemnifying party's acts or omissions or exercise of any rights or duties under this Agreement. Such indemnification shall further extend to any Party's failure to comply

with the terms of this Agreement and any unauthorized use of any trademark, copyright infringement or the like in connection with the manufacture, design, sale, advertising, promotion or use of the Mark. Such obligations shall survive and continue beyond any termination or expiration of this Agreement.

14.02 The Concurrent User, any licensee, and their respective successors or assignees must carry paid up commercial general liability insurance in the sum of not less than three million dollars ($3,000,000) per occurrence to protect the City against any and all claims, loss or damage, whether in contract or tort, including claims for injuries to, or death of persons, or damage to property, whether such injuries, death or damages be attributable to the statutory or common law negligence or any other acts of the Concurrent User, any licensee, their respective employees, or otherwise in connection with the license granted hereunder. Such insurance shall be obtained from a company, or companies, that may lawfully issue the required policy and have an A.M. Best rating of at least A-7 or a Standard and Poor's rating of at least AA, unless prior written approval is obtained from the Mayor's Office of Operations. Such policy or policies shall name the City, its officers and employees as additional insureds, and shall provide that in the event of cancellation the City shall be notified at least thirty (30) days in advance of the cancellation, and shall provide that the carrier shall appear, defend and indemnify the City, including the agents, servants and employees of the City, in connection with all such claims, loss or damage. Prior to the effective date of this Agreement, the Concurrent User shall provide to the City a certificate of insurance, in a form acceptable to the City, certifying the issuance and effectiveness of the required insurance policy. The Concurrent User and any licensee shall deliver to the City a copy of the required insurance policy annually. Such insurance shall be maintained for at least six (6) years after the last date of sale of any goods or services under the Mark. In the event that the Concurrent User, any licensee or their respective successors or assignees fail at any time to carry adequate liability insurance as required herein, the City shall have the right to terminate this Agreement immediately. The existence of such insurance shall in no way limit the Parties' indemnification of each other under this Section.

## 15.   Relationship of the Parties

15.01 Nothing contained herein shall be construed to place the Parties in the relationship of partners or joint venturers, or principal and agent, or employer and employee, and no Party shall have the power to obligate or bind the other Party in any manner whatsoever.

## 16.   Notices

16.01 All communications, notices and exchanges of information contemplated herein, or required or permitted to be given under this Agreement, must be in writing and shall be sent by hand, by registered or certified mail, or by overnight courier. Unless specifically provided to the contrary, notices will be deemed effective when delivered in person or on the date five (5) business days after it is placed in the mail, postage prepaid, or one (1) business day after being deposited with an overnight courier, directed to the following addressees:

If to the Concurrent User:

     Louis Bivona
     8 Somerset Rd
     Tenafly NJ 07670

     With a copy to:

     Joshua W. Cohen, Esq.
     Day Pitney LLP
     One Audubon Street
     New Haven, CT  06511

     and

     J. Lucy Nelson, Esq.
     1625 Mid Valley Drive
     Steamboat Springs, CO  80487

If to the City:

     Elizabeth Smith.
     Assistant Commissioner
     New York City Department of Parks & Recreation
     The Arsenal
     830 Fifth Avenue
     New York, New York 10065

     With a copy to:

     General Counsel
     New York City Department of Parks & Recreation
     The Arsenal
     830 Fifth Avenue
     New York, New York 10065

     and

     Gerald Singleton, Esq.
     The New York City Law Department
     100 Church
     New York, New York 10007-2601

14

Notification of a requested change in the address of a Party or the identity of the designated recipient of notices under this section must be provided in the same manner as any other notice.

## 17.   Miscellaneous Provisions

17.01   Enforceability.   If any portion or provision of this Agreement is to any extent declared unenforceable by a court of competent jurisdiction, then such provision will thereby be deemed to be reformed to the minimum extent necessary to make it enforceable. Each portion and provision of this Agreement is and will be valid and enforceable to the fullest extent permitted by law.

17.02   Entire Agreement.   This Agreement constitutes and contains the entire agreement between the Parties concerning the subject matter of this Agreement and supersedes all prior negotiations, proposed agreements, and/or understandings, if any, between the Parties concerning the subject matter of any of the terms of this Agreement.

17.03   Amendment; Waiver.   This Agreement may not be modified except by another writing executed all of the Parties. No waiver of any provision of this Agreement will be enforceable against a Party unless such waiver is expressly set forth in writing and such writing is signed by such Party. No failure or delay by any Party in exercising any right hereunder shall operate as a waiver or relinquishment of the future performance thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right.

17.04   Successors and Assigns.   This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns, and, with regard to the City, its vendors, contractors, concessionaires, or agents.

17.05   Further Assurances.   Each of the Parties hereto shall perform such further acts and execute and deliver or cause to be executed and delivered such further documents as may be reasonably necessary or appropriate to carry out the intent and purpose of this Agreement, including, without limitation, any and all documents necessary for compliance with statutes and regulations with respect to trademark applications and registrations (including, without limitation, consents to the applications to register trademarks, to the extent such registration would be in accordance with the provisions of this Agreement).

17.06   Governing Law; Jurisdiction. This Agreement is governed by, and is to be interpreted and construed in accordance with, the laws of the State of New York, as applied to agreements among residents of the State of New York entered into and to be performed entirely within the State of New York, and without regard to conflict of law principles. Each Party (and, without limitation, any licensee or sublicensee of Concurrent User) hereby irrevocably submits to the exclusive jurisdiction of, and venue in, any state or federal court located within City of New York in the state of New York for the purposes of any suit, action or other proceeding arising out of this Agreement, and agrees to commence any such suit, action or other proceeding only in such courts.

17.07  Counterparts. This Agreement may be executed in one or more counterparts (and may be delivered via facsimile or similar instantaneous electronic transmission device pursuant to which the signature of or on behalf of such Party can be seen), each of which will be deemed an original and all of which together will constitute one and the same instrument.

17.08  No Third Party Beneficiaries. Unless otherwise expressly provided herein, nothing in this Agreement is intended, or shall be construed, to confer upon or give any person or entity other than the Parties hereto and their respective successors and permitted assigns, any rights or remedies under or by reason of this Agreement.

[SIGNATURE PAGE FOLLOWS]

16

IN WITNESS HEREOF, the Parties have executed this Agreement as of the date first set forth above.

THE CITY OF NEW YORK

By: _____

Title: _____

Date: _____

Approved as to form

_____
Acting Corporation Counsel

NOV 0 4 2011

[CONCURRENT USER]

By: _____

Title: _____

Date: _____

17

EXHIBIT A

Current Logo



## EXHIBIT B

### Restricted Area in Pennsylvania

The Restricted Area in Pennsylvania shall consist of the following counties:

- Bucks
- Lehigh
- Berks
- Lebanon
- Dauphin
- Perry
- Cumberland
- Adams
- York
- Lancaster
- Chester
- Montgomery
- Delaware
- Philadelphia

A map of Pennsylvania is provided below for ease of reference.



EXHIBIT C

Disclaimers

All uses of the Concurrent User's Mark for Restaurant Services and all use of the Product Marks and Oil and Dressing Mark (e.g., product packaging, bottle labels, promotional materials, print advertising, menus, invoices and quotes, business cards and stationery, website uses) other than for outside signage shall use the following disclaimer: "Not Affiliated with Tavern on the Green in Central Park in New York City." The typeface used for the disclaimer shall, in all instances, be the same type and color as the typeface used for the most prominent use of the Mark on the page (e.g., bold trademark typeface requires bold typeface disclaimer) and shall appear immediately below and in close proximity to the first use of the Mark. The point size used for the disclaimer shall be a minimum of 12 point where the largest typeface for the Mark is 36 point or less. Where the point size for the largest use of the Mark is greater than 48 point, the typeface for the disclaimer shall be 25% of such type, but not less than 18 point, with the additional requirement that any disclaimer that is less than 20 point shall be boldface.

Outdoor accessory, on-site signage for use of the Concurrent User's Mark: A disclaimer shall not be required for outdoor signage at the entrance to a restaurant where only the Concurrent User's Mark appears without added text. Outdoor accessory signage includes awnings, entry doors, neon signage and stenciled lettering on windows.

Disclaimers within Restaurant: Signage or placards shall be placed or affixed in the line of sight of customers in the following areas of the restaurant: where customer/guests are greeted/check-in/make reservations; the bar area; the coat check area; on the wall at eye level adjacent to bathroom entry doors. The lettering of the disclaimer shall be at least one-half inch in height and read as follows: "This Restaurant (or Establishment) Is Not Affiliated with Tavern on the Green In Central Park In New York City."

Billboards and other non-accessory outdoor signage: All outdoor signage promoting restaurant services or products using the Mark, including but not limited to billboards and posters, shall include the disclaimer with a asterisk accompanying the most prominent use of the Mark ("*Not Affiliated with Tavern on the Green in Central Park in New York City") immediately below the largest use of the Mark in said signage, using lettering that is not less than 25% of the size of the lettering used for the Mark in the same type and color as the lettering used for the Mark.

EXHIBIT D

Acceptable Images

# Tavern Interior Photos

June 9, 2010

 

 



EXHIBIT E

Product Standards in the Product Restricted Area

(a)  Any products bearing the Mark that the City consents to be sold in the Product Restricted Area shall meet or exceed the requirements imposed by any and all laws, regulations, government standards, guidelines, manufacturing codes, rules, and the like applicable to such products. Without limiting the foregoing, no such products shall be manufactured from any flammable, explosive, toxic, or otherwise inherently dangerous materials or substances, nor designed so as to constitute any inherent danger to the consumer. Further, the Concurrent User agrees that the products shall be of a standard of quality at least as high as that of any product samples initially approved by the City so as to be suited to their exploitation and to the protection and enhancement of the Marks and the goodwill pertaining thereto.

(b)  Such products shall be manufactured in accordance with the manufacturing specifications, protocol, safety, and quality standards that have been reviewed and approved in writing by the City ("**Specifications**"), which, once approved, shall be deemed to be a part of this Agreement.  The City may amend such Specifications from time to time and shall provide the Concurrent User with reasonable notice of such changes so that the products may be adjusted to meet such changed quality standards, if required.

(c)  The Specifications shall include at least the following information (and other information which the City may request regarding particular products): (i) a description of the materials used in the products, the materials' dimensional tolerances, performance and durability requirements, specifications that enable the materials to meet governmental regulatory requirements (if any) and such other appropriate information that will accurately describe the products and their expected performance during use by the consumer; and (ii) a quality assurance plan that is used to assure the continuing acceptable quality of the products. The plan shall include a description of the quality controls observed in the products' manufacture, and the procedures followed to audit and verify continued quality and conformance to specifications of the products, as well as applicable laws and regulations.

(d)  If such product is not yet on the market outside the Product Restricted Area, the Concurrent User agrees to submit, at the City's request and at no cost to the City (i) initial sketches and/or design concepts; (ii) finished artwork or final proofs; (iii) prototypes or pre-production samples; and (iv) a minimum of one (1) and twelve (12) final production samples (the "**Samples**") of the products (and any variations thereof) for the City's inspection, testing, analysis and approval prior to any sale or shipment of the products to retail stores physically located in the Product Restricted Area.  If such product is already on the market outside the Product Restricted Area, the Concurrent User agrees to submit twelve (12) Samples from the current production run of such products for the City's inspection, testing, analysis and approval prior to any sale or shipment of the products to retail stores physically located in the Product Restricted Area.  Concurrent User shall also provide initial samples of subsequent production run(s) if such subsequent production run(s) vary in any manner from prior runs.

(e)  The City shall use reasonable efforts to communicate its written consent or disapproval within forty (40) days of receipt of Samples of the products.  Any Samples not

expressly approved shall be deemed disapproved. If the Samples are approved pursuant to this paragraph, the Concurrent User shall not depart therefrom in any material respect without the City's prior written consent, and the City shall not withdraw its approval of the Samples except for good cause.

(f) The Concurrent User shall at its own cost handle all product warranty and/or guarantee issues, responses and compliance requirements, as well as all consumer inquires or complaints (collectively, "Consumer Inquiries") relative to any of the products. The City shall forward to the Concurrent User for handling any and all such Consumer Inquiries that the City receives. Upon request by the City, the Concurrent User shall advise the City in writing of the manner in which it handled any Consumer Inquiry. In addition, the Concurrent User shall provide the City with a quarterly report containing all data and information regarding Consumer Inquiries handled during the quarter.

(g) The Concurrent User shall immediately advise the City of any product recall considerations or deliberations and provide the City with the right to attend and have input into such deliberations. The City shall have the ability to declare a product recall of such products as the City determines in good faith after consulting with the Concurrent User that any product recall is necessary for reasons of public health, safety, welfare or damage to reputation or good will. The Concurrent User shall bear any and all costs related to any product recall whether voluntary, required by a governmental authority or the City. The Concurrent User shall have in place a comprehensive lot tracking program, starting with raw materials, to ensure such recall effectiveness.

(h) The Concurrent User agrees not to use child labor in the manufacture of or otherwise in connection with any Products. The term "child" shall refer to a person younger than the local legal minimum age for employment or the age for compelling compulsory education, but in no case shall any children younger than fifteen (15) years of age (or fourteen (14) years of age where local law allows) be used to manufacture, package or sell the products. In addition, the Concurrent User agrees to comply with all applicable minimum wage, overtime, occupational safety and health and environmental protection laws in the manufacture and packaging of products. The Concurrent User shall perform all obligations under this Agreement in accordance with applicable provisions of federal, state and local laws, rules and regulations as are in effect from time to time.

## EXHIBIT F

### Royalty Statements; Payments/Audit

The Concurrent User shall furnish to the City the following no later than forty-five (45) days after the end of each calendar quarter (beginning with the calendar quarter in which the initial shipment of any product to which the City has consented in writing to be sold within the Product Restricted Area):

(a)   complete and accurate statements in a format approved by the City and certified in writing to be accurate by an officer of the Concurrent User, itemized by product item number and showing the net number of units sold inclusive of returns, item description and Average Sales price of the product sold by the Concurrent User or any licensee during the preceding quarter. Such statements shall be furnished to the City whether or not any products have been sold during the preceding quarter; and

(b)   payment of the royalty and/or guaranteed minimum royalty due from sales during the preceding quarter.

The receipt or acceptance by the City of any statements furnished pursuant to this Agreement or any royalties paid hereunder (or the cashing of any royalty checks paid hereunder) shall not preclude the City from questioning the correctness of such statement or payment at any time.  In the event any inconsistencies or mistakes are discovered in such statements or payments, they shall immediately be rectified and the appropriate payments made by the Concurrent User. In the event of an overpayment by the Concurrent User, the Concurrent User may deduct such mutually verified overpayment from any earned royalty or guaranteed minimum royalty payment due with the next regular quarterly royalty statement and payment. In the event no further royalty payments would be forthcoming after discovery and mutual verification of the payment, then the Concurrent User shall receive a refund of such overpayment within thirty (30) days after its written request for a refund is received by the City.

In the event that the Concurrent User fails to make any payments, including earned royalty and audit findings, when such payments are due under this Agreement, interest shall be charged at an annual rate of eighteen percent (18%), or the maximum rate allowed by law, whichever is lower.  All payments made hereunder shall be in United States currency drawn on a United States bank.  The Concurrent User shall keep accurate books of account and records covering all transactions related to this Agreement for at least six (6) years after termination or expiration of this Agreement.

The City or its authorized agent shall have the right during business hours upon forty-eight (48) hours' advance notice to examine and request copies of the Concurrent User's books, records, and accounts and all other documents and materials in the possession or under the control of the Concurrent User relating to the sale of products featuring the Mark to such extent as may be necessary to determine the accuracy or inaccuracy of any royalty statements submitted by the Concurrent User to the City.  The Concurrent User shall segregate its records

and agrees that such audit may be used as a basis for settlement of charges under this Agreement. The City may also at any time select any independent accounting firm to review the Concurrent User's books, records and accounts, and to check shipments and verify the account (hereinafter referred to as the "Audit"). In the event that the Audit reveals any underpayment by the Concurrent User to the City, the Concurrent User shall remit payment for the amount shown to be due within ten (10) days, of receipt of official audit report plus a late charge in the amount of eighteen percent (18%) per annum, or the maximum rate allowed by law whichever is lower, on all amounts shown to be owing by the Concurrent User. In the event that the Audit determines that the Concurrent User has underpaid by an amount equal to five percent (5%) or more of the total amount shown to be due to the City for the period audited, the Concurrent User shall reimburse the City or its agent for all costs and expenses of the Audit. In addition, if the discrepancy is an amount equal to five percent (5%) or more and a discrepancy or underpayment of 5% or more had been found in at least one prior instance, the City may terminate this Agreement by giving the Concurrent User notice within sixty (60) days after receipt of the audit report disclosing the discrepancy. The Concurrent User shall retain all books of account and records relating to this Agreement for at least six (6) years after the termination or expiration of this Agreement, and any renewals thereof and the City's right to audit such records during the duration of this Agreement and for six (6) years thereafter. The parties acknowledge and agree that the powers, duties, and obligations of the Comptroller of the City of New York pursuant to the provisions of the New York City Charter shall not be diminished, compromised, or abridged in any way.

EXHIBIT G

Form of Licensee Agreement

## LICENSEE AGREEMENT

This Licensee Agreement (the "Agreement") is entered into as of _____ __, 2011 by and between _____ ("Concurrent User") and _____ ("Licensee"). Concurrent User and Licensee are each a "Party" and together the "Parties."

WHEREAS, Concurrent User and the City of New York (the "City") are parties to that certain Use Agreement dated as of _____ __, 2011, pertaining to the use of the "Tavern on the Green" trademarks (the "Use Agreement"); and

WHEREAS, Concurrent User and Licensee wish to enter into an agreement whereby Concurrent User licenses rights under the Use Agreement to Licensee (the "License Agreement").

NOW, THEREFORE, in consideration of the promises set forth below, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree to the terms set forth herein:

1. Licensee acknowledges receipt of a copy of the Use Agreement and hereby unconditionally agrees to adhere to all the terms, conditions and limitations on the use of the "Tavern on the Green" trademarks set forth in the Use Agreement.

2. This Agreement is independent of any other agreement that may exist between Concurrent User and Licensee.

3. Licensee acknowledges that the Use Agreement may not be amended or modified except by another writing executed by Concurrent User and the City. Any change or modification without the City's consent shall be of no force or effect as to the City and may constitute grounds for termination of the Use Agreement and/or the License Agreement.

4. If any portion or provision of this Agreement is to any extent declared unenforceable by a court of competent jurisdiction, then such provision will thereby be deemed to be reformed to the minimum extent necessary to make it enforceable. Each portion and provision of this Agreement is and will be valid and enforceable to the fullest extent permitted by law.

5. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns.

6. This Agreement is governed by, and is to be interpreted and construed in accordance with, the laws of the State of New York, as applied to agreements among residents of the State of New York entered into and to be performed entirely within the State of New York, and without regard to conflict of law principles. Each Party hereby irrevocably submits to the exclusive jurisdiction of, and venue in, any state or federal court located within City of New York in the State of New York for the purposes of any suit, action or other proceeding arising out of this Agreement, and agrees to commence any such suit, action or other proceeding only in such courts.

7. This Agreement may be executed in one or more counterparts (and may be delivered via facsimile or similar instantaneous electronic transmission device pursuant to which the signature of or on behalf of such Party can be seen), each of which will be deemed an original and all of which together will constitute one and the same instrument.

IN WITNESS HEREOF, the Parties have executed this Agreement as of the date first set forth above.

[CONCURRENT USER]

By:_____

Title:_____

Date:_____


[LICENSEE]

By:_____

Title:_____

Date:_____

2

EXHIBIT H

Form of Assignment Agreement

820718

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This ASSIGNMENT AND ASSUMPTION AGREEMENT (the "Assignment and Assumption Agreement") is entered into as of _____, 20___ by and between _____ ("Assignor") and _____ ("Assignee"). Assignor and Assignee are each a "Party" and together the "Parties."

WHEREAS, Assignor and the City of New York (the "City") are parties to that certain Use Agreement dated as of _____, 2011, pertaining to the use of the "Tavern on the Green" trademarks (the "Use Agreement"); and

WHEREAS, Assignor wishes to assign all of its rights and delegate all of its obligations under the Use Agreement to Assignee, and Assignee wishes to accept such assignment and assume such obligations.

NOW, THEREFORE, in consideration of the promises set forth below, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree to the terms set forth herein.

1. Assignor hereby assigns, transfers, and conveys to Assignee, and Assignee hereby accepts, all of Assignor's right, title, and interest in and to the Use Agreement and all of the rights, benefits and privileges of Assignor thereunder, in each case to the fullest extent assignable under applicable law.

2. Assignor hereby delegates to Assignee, and Assignee hereby assumes, all obligations, responsibilities and duties of Assignor under the Use Agreement.

3. Assignee acknowledges receipt of a copy of the Use Agreement and agrees to be bound by all the terms, conditions and limitations contained in the Use Agreement.

4. The Parties hereby acknowledge and agree that upon the execution and delivery of this Agreement by both Parties, the rights, duties and obligations of Assignor under the Use Agreement shall immediately cease and such rights shall be fully vested in and such duties and obligations shall be delegated to, and be the sole duties and obligations of, Assignee.

5. This Agreement is independent of any other agreement that may exist between the Assignor and Assignee.

6. Assignee acknowledges that the Use Agreement may not be amended or modified except by another writing executed by Concurrent User thereunder and the City. Any change or modification without the City's consent shall be of no force or effect as to the City and may constitute grounds for termination of the Use Agreement.

7. If any portion or provision of this Agreement is to any extent declared unenforceable by a court of competent jurisdiction, then such provision will thereby be deemed to be reformed to the minimum extent necessary to make it enforceable. Each portion and provision of this Agreement is and will be valid and enforceable to the fullest extent permitted by law.

8. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns.

9. This Agreement is governed by, and is to be interpreted and construed in accordance with, the laws of the State of New York, as applied to agreements among residents of the State of New York entered into and to be performed entirely within the State of New York, and without regard to conflict of law principles. Each Party hereby irrevocably submits to the exclusive jurisdiction of, and venue in, any state or federal court located within City of New York in the State of New York for the purposes of any suit, action or other proceeding arising out of this Agreement, and agrees to commence any such suit, action or other proceeding only in such courts.

10. This Agreement may be executed in one or more counterparts (and may be delivered via facsimile or similar instantaneous electronic transmission device pursuant to which the signature of or on behalf of such Party can be seen), each of which will be deemed an original and all of which together will constitute one and the same instrument.

IN WITNESS HEREOF, the Parties have executed this Agreement as of the date first set forth above.

[ASSIGNOR]

By:_____

Title:_____

Date:_____


[ASSIGNEE]

By:_____

Title:_____

Date:_____

2

822920